UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————————

RACHEL ANAUO,

                              Plaintiff,        **No. 1:15-cv-00933(MAT)**
                                                **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.
———————————————————————————

## INTRODUCTION

     Represented by counsel, Rachel Anauo ("Plaintiff") brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## PROCEDURAL STATUS

     On September 13, 2012, Plaintiff protectively filed an application for DIB, alleging disability since June 6, 2012, due to major depression, anxiety, panic attacks, chronic bilateral plantar fasciitis, and high blood pressure. After her application was denied on November 29, 2012, a hearing was held before administrative law judge David S. Lewandowski ("the ALJ") on January 15, 2014, at which Plaintiff and her attorney appeared. (T.34-64). Josiah L. Pearson, an impartial vocational expert ("the VE"), also appeared and testified at the hearing.   On

June 23, 2014, the ALJ issued a decision finding Plaintiff not disabled. (T.16-33). That decision became the Commissioner's final decision on September 3, 2015, when the Appeals Council denied Plaintiff's request for review. This timely action followed.

The parties have filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The Court adopts and incorporates by reference herein the undisputed and comprehensive factual summaries contained in the parties' briefs. Plaintiff does not challenge the physical aspect of the ALJ's RFC assessment, so the Court will limit its recitation of the medical evidence to the opinions issued by Plaintiff's treating psychiatrist, her therapist, and the consultative psychologist who examined Plaintiff at the Commissioner's request.

For the reasons discussed below, the Commissioner's decision is reversed, and the matter is remanded for development of the record with regard to Plaintiff's treating psychiatrist and for re-application of the treating physician rule.

## SUMMARY OF RELEVANT OPINION EVIDENCE

### I.   Treating Psychiatrist Phillip Scozzaro, M.D.

#### A.   The Letter Reports

On September 17, 2012 (T.346); October 4, 2012 (T.352); November 12, 2012 (T.350); February 20, 2013 (T.353); and August 12, 2013 (T.354), Dr. Scozzaro issued letter reports, at the request of an individual or entity who is not identified in the

record, regarding her disability status. Dr. Scozzaro explained that Plaintiff had stopped working as a drug abuse counselor in April 2012. After having a total hysterectomy, she began experiencing severe menopausal symptoms that rendered incapable of accomplishing her work, and she was terminated from her job. (T.352). She was unable to take estrogen, the usual treatment for severe menopausal symptoms, because she had a genetic predisposition to breast cancer; her sister had had breast cancer at age 40. Dr. Scozzaro noted that Plaintiff also suffered from binge or stress eating at night after working, that she had trouble losing weight, and had thought of suicide but not seriously. In the September 2012 report, Dr. Scozzaro opined Plaintiff's prognosis was "fair to poor for returning to work in the next year." (T.352). He planned to adjust her depression medications and continue to see her in counseling.

On November 12, 2012, Dr. Scozzaro stated that Plaintiff had cyclothymic disorder and ongoing post-menopausal symptoms which seemed better with gynecological treatment (though she still was unable to take estrogen). (T.350-51). Dr. Scozzaro opined Plaintiff's prognosis was "very poor for returning to work in the next year or two . . ." (T.351). On February 20, 2013, Dr. Scozzaro completed another report regarding Plaintiff's disability, and opined that her prognosis "very poor for returning to work in the next year or two . . ." (T.353). On August 12,

-3-

2013, Dr. Scozzaro submitted another letter report, noting her continued diagnoses of cyclothymic disorder and post-menopausal symptoms. (T.354). She had started taking lithium in November 2012 for her fluctuating moods, with some improvement noted by her and her husband. She was also taking Zoloft, and had discontinued Buspar and Klonopin. He opined that her prognosis was still "very poor for returning to work in the next year or two." (T.354). He considered her disabled at that time from "any employment, mental or physical [sic]." (T.354).

## B.   Mental Residual Functional Capacity Questionnaire

On January 6, 2014, Dr. Scozzaro completed a Mental Residual Functional Capacity Questionnaire at the Commissioner's request. (T.378-82). He noted that he treated Plaintiff for about a year and a half on a monthly basis. She had been without health insurance since June 30, 2012, to January 1, 2014 and had to pay for her visits. Her diagnoses were cyclothymia with severe panic attacks, depression, and personality disorder. She was taking lithium and had no major side effects. Dr. Scozzaro noted that bipolar disorder should be ruled out when she obtains insurance coverage. Her diagnoses were chronic but stable, though she had only made modest gains during treatment. Dr. Scozzaro assessed a GAF score of 40.

Dr. Scozzaro's clinical findings included depression, not being socially rounded, withdrawing into herself and not contacting friends and hardly reacting to her husband. He opined that her

prognosis was poor to fair. Her total hysterectomy on February 22, 2012, caused a sudden estrogen-level drop, leading to stress and panic attacks, which Dr. Scozzaro characterized as "the big reason [she] had to stop working." (T.378).

Dr. Scozzaro indicated Plaintiff had the following signs and symptoms: appetite disturbance with weight change; decreased energy; passive thoughts of suicide; blunt, flat or inappropriate affect; hyperactivity with anxiety; motor tension; overeating as an impairment in impulse control; poverty of content of speech; generalized persistent anxiety; mood disturbance; difficulty thinking; psychomotor agitation or retardation; persistent disturbances of mood or affect; change in personality; apprehensive expectation; emotional withdrawal or isolation; psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities since her operation in February 22, 2012; bipolar syndrome with a history of episodic periods of both manic and depressive syndromes; emotional lability; flight of ideas; manic syndrome, but sometimes depression lasted longer; overeating as a deeply ingrained, maladaptive pattern of behavior; easy distractibility; short-term memory impairment; sleep disturbance by increased or decreased hot flashes; decreased need for sleep at times; loss of intellectual ability; and recurrent severe panic

-5-

attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (T.378-79).

Dr. Scozzaro indicated that Plaintiff had no useful ability to function with regard to maintaining attention for two-hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; dealing with normal work stress; understanding and remembering detailed instructions; carrying out detailed instructions; and dealing with stress associated with semiskilled and skilled work. (T.380). He also indicated that Plaintiff was "seriously limited"[1] in her ability to remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; respond appropriately to changes in a routine work

---

[1]

The questionnaire defined "seriously limited" to mean that the individual's ability to function in that area was seriously limited and would frequently be less than satisfactory in any work setting. (T.379).

setting; set realistic goals and make plans independently of others; interact appropriately with the general public; maintain socially appropriate behavior; and travel in an unfamiliar place. (T.380-81).

Dr. Scozzaro explained that Plaintiff's limitations were due to her depression since February 22, 2012. (Tr. 381). He noted that her IQ had not been tested but that her thinking ability decreased as a result of her depression. He indicated that Plaintiff's psychiatric condition exacerbated her experience of pain and any other physical symptoms, making her more sensitive to pain. In Dr. Scozzaro's opinion, if Plaintiff attempted to return to even low stress employment in which she would only have to occasionally interact with co-workers and supervisors, it would lead to an exacerbation of her symptoms that would prevent her from performing full-time, competitive employment. (T.381). He further opined that Plaintiff's symptoms would lead to an inability to stay on task for even simple task work tasks for more than 20% of an 8-hour workday. (T.381). Dr. Scozzaro opined that Plaintiff would be unable to complete a normal workday and workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods. He anticipated that Plaintiff's impairments or treatment would cause her to be absent from work more than 4 days per month. Plaintiff's impairment lasted or was expected to last at least 12 months. He

stated that Plaintiff was not a malingerer. The unpredictability of
when Plaintiff's symptoms appeared would also cause her difficulty
in working at a regular job on a sustained basis. Dr. Scozzaro
opined that Plaintiff has been limited as stated in the
questionnaire since at least April 13, 2012. He further opined that
Plaintiff had been unable to engage in full-time competitive
employment on a sustained basis at any time since April 13, 2012.
As a post-script, Dr. Scozzaro noted that the usual treatment for
Plaintiff's surgically-induced menopause was hormone replacement
therapy which was not possible for Plaintiff because of her genetic
predisposition to breast cancer.

## II.  Treating Therapist Lucia Wronski, LCSW-R

Registered licensed master social worker ("LCSW-R") Lucia
Wronski of Counseling and Enrichment Resource Center ("CERC"), at
the Commissioner's request, completed a brief form titled
"Information Request" on an unspecified date. (T.276). She
indicated that she had treated Plaintiff on May 16, 2012; May 21,
2012; June 4, 2012; June 13, 2012; July 23, 2012; August 3, 2012;
August 23, 2012; September 6, 2012; and September 25, 2012.
(T.276). Although the form did not ask for any commentary, LCSW-R
Wronski noted that Plaintiff was diagnosed with moderate depression
which impeded her ability to function efficiently in a job and in
certain tasks of daily living. (T.276).

### III. Consultative Psychologist Susan Santarpia, Ph.D.

On , Upon mental status examination, Dr. Santarpia found that Plaintiff's demeanor and responsiveness to Manner of relating and overall; she was dressed neatly and well-groomed; motor behavior was normal and eye contact was appropriate; and thought processes were coherent and goal directed with no evidence of hallucinations, delusions , or paranoia in the evaluation setting. Plaintiff's affect was of full range and appropriate in speech and thought content; her mood was neutral. Her attention and concentration were "[g]rossly intact" insofar as Plaintiff could do simple one-step, but not two-step, mathematical calculations, and correctly did serial subtraction. Plaintiff's recent and remote memory skills were "[i]ntact" insofar as she could recall 3-of-3 objects immediately, and 3-of-3 objects after a delay; and she could recite 5 digits forward and 3 digits in reverse order. Dr. Santarpia "[e]stimated" Plaintiff's cognitive functioning to be in the "average range of ability," with a general fund of information that was "appropriate to experience." Plaintiff's insight and judgment were both "[f]air." Dr. Santarpia indicated diagnoses of depressive disorder, not otherwise specified ("NOS") and anxiety disorder, NOS.

For her medical source statement, Dr. Santarpia stated that Plaintiff "presents as able to follow and understand simple directions and instructions, perform simple tasks independently,

maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress within normal limits[,]" although she demonstrates "[m]ild impairment" in "performing complex tasks independently." Dr. Santarpia commented, "Difficulties are caused by lack of motivation." Dr. Santarpia concluded that the results of the evaluation appear to be consistent with psychiatric problems which, in and of themselves, do "not appear to be significant enough to interfere with" Plaintiff's "ability to function on a daily basis."

## THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that Plaintiffs meets the insured status requirements of the Act through December 31, 2016, and had not engaged in substantial gainful activity since June 6, 2012, the alleged onset date.

At step two, the ALJ determined that Plaintiff has the following severe impairments, meaning that they significantly limit her ability to perform basic work activities: neuropathy in feet, obesity, right knee degenerative changes, cyclothymia,[2] panic attacks and personality disorder. The ALJ found that Plaintiff's

---

[2]

"Cyclothymia, also called cyclothymic disorder, is a rare mood disorder. . . that causes emotional ups and downs, but . . . not as extreme as those in bipolar I or II disorder." http://www.mayoclinic.org/diseases-conditions/cyclothymia/basics/definition/con-20028763 (last accessed Dec. 14, 2016).

plantar fasciitis and hypertension are not severe impairments, a finding that Plaintiff does not challenge on appeal.

At step three, the ALJ considered whether any of Plaintiff's impairments, singly or in combination, meet or medically equal the severity of one of the impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 & 404.1526). In particular, Plaintiff's right knee pain has not resulted in the inability to ambulate effectively as defined by Listing 1.00(B)(2)(b), and thus the severity criteria of Listing 1.02(A) (Major Dysfunction of a Major Peripheral Weight-Bearing Joint) have not been met. Plaintiff's diabetic neuropathic pain does not meet the criteria set forth in Listing 11.14 (Peripheral Neuropathies) because she has retained the ability to walk effectively. Additionally, although Plaintiff experiences peripheral neuropathy, it has improved with Sombra and, in mid-2013, Plaintiff received modified orthotics which successfully addressed her residual pain. With regard to Plaintiff's mental impairments, the ALJ found that they do not, either singly or in combination, meet or medically equal the criteria of Listing 12.04 (Affective Disorders), because she has "mild restriction" in activities of daily living and social functioning; "moderate difficulties" in maintaining concentration, persistence or pace; and had not experienced any episodes of decompensation, which have been of extended duration.

Before proceeding to the next step, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), and determined that she can

> perform sedentary work as defined in 20 CFR 404.1567(a) except she can stand and walk for one hour during an eight hour workday; she can stand and walk for ten minutes at one time; . . . can occasionally climb stairs and balance; . . . can frequently engage in kneeling, crouching and crawling; . . . cannot climb ladders, ropes and scaffolds; and . . . can only engage in simple and semi-skilled tasks.

(T.23).

At step four, the ALJ noted that Plaintiff had past relevant work ("PRW") as a substance abuse counselor (Dictionary of Occupational Titles ("DOT") 045.107-058, skilled (svp 8) and sedentary); a central supply worker (DOT 381.687-010, semi-skilled (svp 4) and light exertion); a surgical assistant (DOT 079-364-022, skilled (svp 6) and light exertion); and an assistant program administrator (alcohol/drug abuse treatment program) (DOT 155.167-042, skilled (svp 7) and light exertion). In light of her RFC, the ALJ found Plaintiff is unable to perform any PRW. As of the onset date, Plaintiff was 38 years-old, making her a "younger individual" under the Act.

At step five, the ALJ relied on the VE's testimony that a person of Plaintiff's age, and with her education, work experience, and RFC, could perform the requirements of representative occupations such as addresser (DOT 029.587-010, unskilled (svp 2)

and sedentary), of which there are 21,344 jobs available in the national economy and 294 jobs in the Western New York economy; information clerk (DOT 237.367-022, semi-skilled (svp 4) and sedentary job), of which there are 42,337 jobs available in the national economy and 210 jobs in the Western New York economy); and appointment clerk (DOT 237.367-010, semi-skilled (svp 3) and sedentary job), of which there are 199,085 jobs available in the national economy and 987 jobs in the Western New York economy. Accordingly, the ALJ found that Plaintiff has not been under a disability, as defined in the Act, from June 6, 2012, through the date of the decision.

## SCOPE OF REVIEW

When considering a claimant's challenge to the Commissioner's decision denying benefits under the Act, a district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted), but "defer[s] to the Commissioner's resolution of conflicting evidence." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted)). "The deferential standard

of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## DISCUSSION

Plaintiff's sole contention on appeal is that the ALJ misapplied the treating physician rule and erroneously discounted the reports and the Mental Residual Functional Capacity Questionnaires completed by her treating psychiatrist, Dr. Scozzaro.

The Second Circuit has explained that "[a]lthough the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record. . . ." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (internal and other citations omitted). When an ALJ declines to accord controlling weight to a treating physician's opinion, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion[,]" id. (quoting 20 C.F.R. § 404.1527(d)(2)), such as "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion

with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.'" Id. (quoting 20 C.F.R. § 404.1527(d)(2)).

A corollary to the treating physician rule is the so-called "good reasons rule," which is based on the regulations specifying that "the Commissioner 'will always give good reasons'" for the weight given to a treating source opinion. Halloran, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2); citing 20 C.F.R. § 416.927(d)(2); Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," Rogers v. Commissioner of Social Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record.'" Blakely, 581 F.3d at 407 (quoting Rogers, 486 F.3d at 243; emphasis in Blakely).

Here, the regulatory factors regarding the length of the treatment relationship and the nature of Dr. Scozzaro's practice support a finding that he is a treating source: Dr. Scozzaro is a specialist in the field of psychiatry, and he treated Plaintiff on a consistent basis (approximately once a month) from May 27, 2011, through at least December 9, 2013. (T.343). Indeed, the Commissioner does not dispute that Dr. Scozzaro qualifies as a treating source.

First, the ALJ considered Dr. Scozzaro's letter reports from October 2012, November 2012, February 2013, and August 2013, and decided to give them "no weight[.]" The ALJ provided three reasons for entirely discounting the letter reports. First, the ALJ noted, "a statement that a claimant is disabled or unable to work addresses a question which is reserved to the Commissioner[.].

Second, the ALJ stated, Dr. Scozzaro's "conclusions clearly [we]re based largely on the claimant's subjective complaints and allegations[,]" and the "absence of significant objective findings during Dr. Scozzaro's examinations is given much greater weight than these conclusions." Both of these reasons are contrary to the prevailing law in the Second Circuit. As courts in this Circuit have observed, that "[i]t is axiomatic" that in diagnosing a mental disorder, "a treating psychiatrist must consider a patient's subjective complaints[.]" Santana v. Astrue, No. 12 CIV. 0815 BMC, 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013) (citing Hernandez

-16-

v. Astrue, 814 F. Supp.2d 168, 182 (E.D.N.Y. 2011) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)). Indeed, whether a medical provider is dealing with mental or physical impairments, "consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool,' is a medically acceptable clinical and laboratory diagnostic technique." Id. (quoting Hernandez, 814 F. Supp.2d at 182) (citing Green-Younger, 335 F.3d at 107); see also, e.g., Lopez-Tiru v. Astrue, No. 09-CV-1638 ARR, 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011) (ALJ rejected treating source's opinion because it "was based on subjective complaints," "not supported by clinical findings," and "not confirmed to the extent claimed by the other treating physicians"; district court found that "[t]hese conclusory statements are not 'good reasons' to reject [the doctor's] opinion"). Furthermore, it was improper for the ALJ to assign "much greater weight" to the "absence of significant objective findings during Dr. Scozzaro's examinations. . . ." "The ALJ cannot rely on the absence of evidence, and is thus under an affirmative duty to fill any gaps in the record." Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from . . . [the treating source] sua sponte.") (internal quotations and citations omitted). Thus, to the extent the ALJ believed that Dr. Scozzaro's

opinion was not supported by clinical findings, the ALJ had an obligation to develop the record by re-contacting the doctor. E.g., Lopez-Tiru, 2011 WL 1748515, at *4; see also Thompson v. Colvin, No. 14-CV-3843 JFB, 2015 WL 5330373, at *12 (E.D.N.Y. Sept. 14, 2015) ("[T]he ALJ failed to apply the proper standard for evaluating the opinion of Dr. Richstone, the treating physician. . . . solely on the basis of statements in the April 2012 Report that the ALJ viewed as internally inconsistent and inconsistent with earlier treatment notes—without evaluating his opinion pursuant to the factors detailed in Halloran or recontacting him for clarification, and instead simply assigned more weight to [a review analyst's and non-treating source's] opinions.").

Third, the ALJ rejected Dr. Scozzaro's letter reports because his "opinion that the claimant's physical impairments render her disabled appears to rest, at least in part, on an assessment of physical impairments outside his area of expertise." This mischaracterizes the record as only one of Dr. Scozzaro's four letter reports s stated that Plaintiff was disabled due to her mental impairments and her physical impairments. (T.354). In any event, this reason is misleading, because the ultimate issue of disability obviously is reserved to the Commissioner. However, the narratives of Dr. Scozzaro's four letter reports contained details about Plaintiff's mental impairments, symptoms, and how her functioning was affected by them; these were entitled to

consideration by the ALJ. See Snell v. Apfel, 177 F.3d at 133 ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

Turning to Dr. Scozzaro's January 2014 Mental Residual Functional Capacity Questionnaire, the ALJ gave "no weight to this opinion because Dr. Scozzaro's treatment records do not provide objective mental status examination findings to support" it. (T.26). This reason does not constitute a good reason. To the extent she was concerned that Dr. Scozzaro's psychiatric medical opinion lacked a proper clinical foundation, the ALJ was again obligated to follow-up with the doctor before discounting his opinion. See Lopez-Tiru, 2011 WL 1748515, at *4 ("When a treating physician's opinion 'is not adequately supported by clinical findings, the ALJ must attempt, sua sponte, to develop the record further by contacting the treating physician to determine whether the required information is available.'") (quoting Cleveland v. Apfel, 99 F. Supp.2d 374, 380 (S.D.N.Y. 2000) (citing 20 C.F.R. § 404.1512(e))).

As his second reason for discounting the Questionnaire, the ALJ stated that the functional limitations assigned by Dr. Scozzaro "contradicted the record" because Dr. Scozzaro's notes indicated that Plaintiff was active in church, attended a church picnic, and attended Bible study, all of which require "good social, attention

and concentration skills," according to the ALJ. (T.26). As Plaintiff argues, the ALJ is merely speculating as to what Dr. Scozzaro meant by being "active in church"; it is pure guesswork on his part to conclude that Plaintiff, in fact, socialized with people at the church picnic, and maintained attention and concentration while at bible study. Moreover, even assuming that attending church picnics and bible study are reliable measures of an individual's ability to interact appropriately with employers and supervisors in a normal workplace environment and to maintain attention and concentration at the level required to perform even unskilled competitive full-time employment, there is no suggestion in the record that Plaintiff was attending church picnics and bible study on a "'regular and continuing basis' [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).

As his third reason for rejecting Dr. Scozzaro's Questionnaire, the ALJ asserted that Plaintiff's GAF scores of 51 to 60 (as assessed by her therapist, LCSW-R Wronski) contradicted Dr. Scozzaro's opinion. (T.26). This was inappropriate. Courts in the Second Circuit consistently have refused to find that GAF scores constitute "good reasons" to discount a treating source opinion. See, e.g., Carton v. Colvin, No. 3:13-C-379 CSH, 2014 WL 108597, *14-15 (D. Conn. Jan. 9, 2014) (ALJ improperly discounted treating source's opinion on the grounds that "the finding of

extreme difficulties is patently inconsistent with [the doctor's] own assessment of a GAF of 55"; "the ALJ erred in relying on the GAF score as an indicat[ion] of the severity of the plaintiff's mental impairment") (internal quotation omitted); see also id. at *15 ("A GAF score 'does not have a direct correlation to the severity requirements in [the SSA's] disorders listing.'") (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (Aug. 21, 2000)). Moreover, the GAF scores upon which the ALJ relied were assessed by LCSW-R Wronski, who does not qualify as an "acceptable medical source" under the Commissioner's regulations.

The ALJ did consider any of the appropriate factors relevant to the assessment of a treating physician's opinion, and instead relied on only inappropriate reasons, speculation, and his own lay opinion to dismiss Dr. Scozzaro's various reports. Furthermore, despite identifying gaps in the record based on his belief that Dr. Scozzaro failed to substantiate some of his reports with clinical findings, the ALJ abdicated his duty to develop the record and did not request clarification from Dr. Scozzaro. In short, the ALJ's determination that Dr. Scozzaro's opinions were entitled to no weight at all is marred by legal error and unsupported by substantial evidence in the record.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings is denied, and Plaintiff's Motion for Judgment on the Pleadings is granted to the extent that the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings consistent with this Decision and Order. Specifically, the ALJ is directed to develop the record fully by having all of Dr. Scozzaro's handwritten treatment notes, reports, and questionnaires transcribed. The ALJ is then directed to evaluate Dr. Scozzaro's treating source reports and opinions in light of the appropriate regulatory factors and in accordance with the case law discussed above, re-assess the weight to be given Dr. Scozzaro's opinions, and, if necessary, re-formulate Plaintiff's RFC.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

**S/Michael A. Telesca**

HON. MICHAEL A. TELESCA
United States District Judge

Dated:    December 15, 2016
          Rochester, New York.